### GEORGIA PEANUT CO., Inc. et al. v. INTERSTATE COMMERCE COMMISSION et al.

#### Civ. A. No. 346.

United States District Court
Middle D. Georgia, Albany Division.

Feb. 4, 1953.

C. E. Walker, Columbus, Ga., for plaintiff.

Charles W. Bucy, Associate Sol., Washington, D. C., Henry A. Cockrum, Attorney, U. S. Dept. of Agriculture, Washington, D. C., for intervening plaintiff Secretary of Agriculture.

C. H. Johns, Asst. Chief Counsel, ICC, Washington, D. C., for defendant Interstate Commerce Com.

Jack J. Gautier, U. S. Atty., Macon, Ga., for United States.

J. Carter Fort, Jr., Washington, D. C., James A. Bistline, Washington, D. C., Joseph F. Johnston, Birmingham, Ala., John B. Miller and Lawton & Cunningham, Savannah, Ga., Farkas, Landau & Davis, Albany, Ga., for intervening Railroad defendants.

RUSSELL, Circuit Judge, and DAVIS and CONGER, District Judges.

DAVIS, District Judge.

This is an action to enjoin and set aside an order of the Interstate Commerce Commission and to remand the controversy to said Commission for reconsideration. In accordance with 28 U.S.C.A. § 2284 and 28 U.S.C.A. § 2325, a three-judge court was convened to hear the cause. A hearing was held on December 12, 1952, oral arguments were heard, the record before the Commission was filed with the Court, and written briefs were filed by all parties.

This controversy arises out of a dispute over freight rates for peanuts trans-

ported from points in the southeast to Savannah for foreign export.

Proceedings before the Interstate Commerce Commission were commenced on April 26, 1949 and IJanuary 6, 1950, when the plaintiffs herein filed complaints alleging that, for various reasons, the export rates on raw shelled peanuts from points in Alabama, Georgia, Florida and South Carolina to Savannah were unlawful. They sought reparation on past shipments and the establishment of lower future rates.

A hearing was held on May 3, 1950, before an examiner of the Commission, at which the plaintiffs herein and the interested railroads introduced evidence. On August 17, 1950, the examiner issued his proposed report, in which he found the assailed rates to be legal in every respect. He recommended dismissal of the complaints. The plaintiffs filed exceptions and requested oral argument. After reply by the railroads, Division 3 of the Commission heard oral argument of the parties on April 5, 1951. On April 26, 1951, Division 3 issued its report and order adopting the recommendation of the examiner. The Secretary of Agriculture and the Commodity Credit Corporation then filed their petitions for reconsideration by the entire Commission, on the grounds that Division 3 erred in its interpretation of Section 3(1a) of the Interstate Commerce Act, 49 U.S.C.A. § 3(1a). Reargument was held before the full Commission on January 3, 1952. On February 4, 1952, the Commission issued its order affirming the action of Division 3, one member dissenting and one member not participating.

The rates in question, export rates on raw shelled peanuts, were two cents higher than the domestic rates on that commodity from December 31, 1940 until October 16, 1948, at which time they were lowered to the same level as the domestic rate. The export rates have been the same as the domestic rates since that time.

The plaintiffs are here contending that the order of the Commission approving these rates is illegal and should be set aside, because:

"(1) It fails to give proper effect to Section 3(1a) of the Interstate Commerce Act (49 U.S.C.1946 ed. 3(1a), and is contrary to the intent and purpose of that statutory provision; and

"(2) It fails to find that Section 3(1a) of the Interstate Commerce Act (49 U.S. C.1946 ed. 3(1a) requires the establishment for farm commodities of export railroad rates which are lower than prevailing domestic rates on such commodities 'on the same principles as are applicable in the case of rates on industrial products for export', and

"(3) It fails to find that Section 3(1a) of the Interstate Commerce Act (49 U.S. C.1946 ed. 3(1a) requires railroads to establish and keep in force and effect rates on shipments for export, on farm commodities, no higher than rates published and in effect on like traffic transported for domestic use, in interstate commerce between the same points and via the same carriers."

In passing upon these contentions, Division 3 found, and the Commission affirmed, that: "There is no general principle that export rates shall be less than, or even the same as, the corresponding domestic rates." They found further that "it is clear from the evidence that the principle which has been followed in making export rates on peanuts is no different from that applied to industrial products affected by similar competitive forces."

■ There is substantial evidence in the record to support these findings. This Court, then, must accept them to be facts.

The Commission having found, on the basis of substantial evidence, that there is no rate-making principle requiring export rates to be equal or lower than domestic rates, and that the same rate-making principles were applied in fixing these rates, and they were applied in the same manner as in fixing the export rates on industrial products, there remains for this Court but one question:

■ Does 3(1a) of the Interstate Commerce Act itself require that rates on farm commodities for export be lower than, or equal to, or bear any fixed relationship to

558

the rates on farm commodities shipped for domestic consumption?

We think not.

It should be noted that section 3(1a) of the Interstate Commerce Act makes no reference to domestic rates, agricultural or industrial. The section does not require that export rates on farm commodities bear any fixed relationship to domestic rates, or to either export or domestic rates on industrial products. The section requires only the equal application of rate-making principles in the fixing of rates for farm commodities shipped for export and the fixing of rates for industrial products shipped for export. 49 U.S.C.A. § 3(1a).

This, the Commission found, had been done. Such a finding cannot be reviewed where there is warrant in the record.

The meaning of Section 3(1a) is clear and unambiguous but, if there were any doubt as to its meaning as urged by the plaintiffs, the legislative history of the section would not only support but require the construction here adopted. The deletion of the original Jones amendment in conference was a clear refutation of the contention here urged by the plaintiffs.

It is, therefore, ordered and adjudged that the complaint be, and it is hereby, dismissed.